JOHN CHRISTIAN BROOKS v. STATE OF INDIANA.

[No. 2-373A69.  Filed September 25, 1974.]

*Harriette Bailey Conn* [*Mrs.*], Public Defender of Indiana, for appellant.

*Theodore L. Sendak,* Attorney General, *Robert E. Dwyer,* Deputy Attorney General, for appellee.

SULLIVAN, P.J.—Following judgment and sentence upon a plea of guilty to manslaughter,[1] Brooks instigated post-conviction proceedings alleging that his guilty plea was not voluntarily, knowingly and intelligently made, and that he was denied effective representation of counsel.

We affirm.

The evidence with respect to the offense committed, when viewed most favorably to the State, reveals the following facts:

On the evening of May 23, 1969, Brooks was visiting his mother's home at 2728 North Guilford in Indianapolis. A number of people were present, among them the deceased, one John Herman King.

A witness, Joe Landers, stated that he saw Brooks talking to the decedent in the kitchen of the apartment, and that Brooks was heard to say at that time that he (Brooks) was trying to get some money from someone. Landers left the apartment about 11:45 that night. He had seen Brooks leave just before him. As Landers reached the sidewalk, he saw the decedent and Brooks struggling on the ground. There is a street light in front of the house, and Landers was about

---

1. Prior to August 18, 1969, the effective date of Acts 1969, Ch. 224, the crime of manslaughter was defined in a single statutory section of Ch. 148 of the 1941 Acts. Ind. Ann. Stat. § 10-3405 (Burns 1956). As thus defined, the crime of manslaughter could be committed either voluntarily or involuntarily but the penalty for the single offense of manslaughter was fixed at not less than two nor more than twenty-one years imprisonment. *See Mimms* v. *State* (1967) 249 Ind. 168, 231 N.E.2d 151.

The 1969 General Assembly, however, created two distinct crimes— (1) voluntary manslaughter carrying the two-to-twenty-one penalty and (2) involuntary manslaughter carrying insofar as here pertinent, a one to ten year sentence. IC 1971, 35-13-4-2, Ind Ann. Stat. § 10-3405 (Burns 1974 Supp.).

The 1969 enactment as per Section 2 thereof, did not affect any prosecutions pending prior to August 18, 1969 nor to offenses theretofore committed. The offense to which Brooks pleaded was committed May 23, 1969 and he was charged June 26, 1969. It is therefore of no moment that he pleaded guilty to and was sentenced for the generic crime of "manslaughter".

three feet away from Brooks. Brooks was straddling decedent, with his hands on decedent's neck or face, and decedent was gasping for breath. On being told by Brooks to "go about his business", Landers apparently did just that.

Soon thereafter, King's body was discovered between the sidewalk and street in front of 2726 North Guilford. The cause of death was later determined to be manual strangulation. As onlookers gathered about the body, Brooks appeared, crying and said "I don't want to go back, I don't want to go back." (Brooks had previously been incarcerated.) His cousin asked Brooks "what did you do that for" and told him to get out of town, as the police were being called.

The police soon arrived, and noted signs of a struggle along the small sidewalk leading from Brooks' mother's house towards the street. A small decorative border fence had been damaged, about five to six feet from the front sidewalk, and police officers recovered Brooks' draft registration, draft classification card and a payment book for a clothing store at the location of the apparent struggle.

The next night, May 24, 1969, Brooks was arrested after being discovered fighting with another man in a car. During the course of the arrest, Brooks was observed dropping two rings to the ground. The rings were recovered and proved to be a wedding band and a diamond ring, both belonging to the deceased.

Brooks was indicted on two counts, first degree murder and felony murder. Brooks was represented by two privately retained attorneys. Extensive hearings were held on Brooks' Motion to Let to Bail which the defense utilized to conduct pre-trial discovery.

On October 19, 1970, Brooks appeared in person and by counsel to withdraw his plea of not guilty and to enter a plea of guilty to the charge of manslaughter as covered by count one of the indictment. He was questioned and advised by the court, further witnesses were heard, and the plea was accepted.

Brooks was sentenced to the Indiana State Reformatory for two to twenty-one years.

At the post-conviction hearing, conducted on two separate dates, Brooks was represented by two attorneys from the Public Defender's office. Brooks' petition was denied.

He raises three issues for our review.

1. Was his guilty plea coerced by the threat of life imprisonment on the First Degree Murder charge?
2. Did he sustain the burden of establishing that his guilty plea had not been knowingly and intelligently made?
3. Was he denied adequate representation by counsel?

I

BROOKS' GUILTY PLEA WAS NOT COERCED

Brooks recognizes that this court, quoting from *Lockhart* v. *State* (1971), 257 Ind. 349, 274 N.E.2d 523, 526, observed in *Bonner* v. *State* (1973), 156 Ind. App. 513, 297 N.E.2d 867 that:

> " '* * * the fears of the appellant brought about by the surrounding circumstances cannot be considered the type of coercion which would require the trial court to permit withdrawal of the guilty plea. Under the circumstances the appellant was simply placed in a situation where he was required to make a judgment as to the best course of action for him to take. We cannot say that his decision to plead guilty constituted an involuntary situation simply because of the existence of overwhelming evidence and the threat of a life sentence.' " *See also Brady* v. *United States* (1970), 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747. However, Brooks attempts to distinguish his situation on the grounds that he was crying during one portion of the hearing on the guilty plea.

During the extensive hearing, the court carefully explained the constitutional rights which Brooks was foregoing, assured himself that Brooks fully understood the nature of the penalty he would receive, and fully explored the facts surrounding the crime. During that hearing, the following exchange concerning Brooks' lack of composure took place:

"Q. Do you understand the charge to which you are pleading guilty?

"A. Two to twenty-one.

"Q. How is that?

"A. Two to twenty-one.

"Q. It is called Manslaughter, do you understand that?

"A. Yes.

"Q. And do you understand what the penalty is?

"A. Two to twenty-one.

"Q. Imprisonment for not less than two years nor more than twenty-one years, do you understand that?

"A. Yes, I do.

"Q. You have talked this matter over with your attorney, have you?

"A. Yes, I have.

"Q. And after talking to him I take it that you feel that this plea is in your own best interest, is that about right?

"A. Yes.

"Q. Are you all right now?

"MR. BOWMAN: Are you all right, John?

"A. Yes.

"Q. I want to tell you what is in this indictment, the first count of this indictment to which you are pleading guilty. This is something that I have to do, you understand that, don't you, Mr. Brooks?

"(At this time the defendant was crying.)

MR. BOWMAN: Can I have a moment, just a moment, to talk to him, Your Honor?

THE COURT: All right, then.

(At this time defense counsel talked to defendant.)

"Q. Mr. Brooks, you understand all I am trying to do is find out if you understand what you are doing?

"A. Yes, sir, I understand.

"Q. All right. Now I would like to go over Count One of this indictment, because this is the count under which you are pleading guilty, to make sure that you understand what you are doing here. Count One of this indictment says that on May the twenty-third, 1969, here in Marion County, Indiana that you killed John Herman King, a human being, with premeditated

malice, and that you did it by choking and strangling him with your hands of which you then and there and thereby inflicted mortal wounds in and upon John Herman King, of which mortal wounds he then and there and thereby died. Now do you understand that you are pleading guilty to the crime of Manslaughter as covered by this charge? Do you understand that all right?

"A. Yes, I understand.

"Q. You have talked this matter over with your attorney, have you?

"A. Yes, I have.

"Q. And after talking it over with him, I take it that you feel this plea is in your own best interest, is that about right?

"A. Yes, I do.

"Q. Understanding everything that I have told you here this morning, Mr. Brooks, do you want to plead guilty?

"A. Yes, I do."

While the above discloses that Brooks did cry at one point, it also demonstrates that the trial court delayed the proceedings to insure that Brooks was fully in control and understood exactly what was happening.

The record reveals that Brooks also cried the night of the crime and again when he was arrested the next evening. That Brooks is able to freely externalize his emotions is evident; but it does not require a finding that the tears were the result of coercion.

Brooks also asserts that, because he was charged with two counts of murder, he was threatened with double jeopardy, which threat coerced his guilty plea. Brooks offers no authority for his contention and we have found none. One charged with murder in two counts of the same indictment is not thereby subjected to double or former jeopardy. *Thompson* v. *State* (1972), 259 Ind. 587, 290 N.E.2d 724, cert. denied 412 U.S. 943. *Kokenes* v. *State* (1938), 213 Ind. 476, 13 N.E.2d 524. The specific contention of Brooks is therefore without merit. We note in any event that in *Brady*

v. *United States, supra,* the guilty plea was claimed to be coerced by the threat of a penalty which was later ruled to be unconstitutional. It is thus somewhat akin to the implication of Brooks' argument. The United States Supreme Court in *Brady* found nevertheless, that the plea had been voluntarily entered. Even though Brooks could not have been properly convicted and sentenced under both counts of the indictment *(Thompson* v. *State, supra),* we here conclude that the two count indictment did not constitute such a threat as to render Brooks' plea coerced.

Neither the existence of the two count indictment, nor possibility of suffering a greater penalty on conviction of first degree murder, nor the fact that Brooks broke into tears satisfies Brooks' burden of proving that his plea was coerced.

## II

## BROOKS FAILED TO PROVE THAT HIS GUILTY PLEA WAS NOT KNOWINGLY AND INTELLIGENTLY ENTERED

It is well established that the Post-Conviction petitioner bears the burden of proof in establishing his right to relief. P.C. 1, § 5, *Hoskins* v. *State* (1973), 261 Ind. 291, 302 N.E.2d 499; *Hughley* v. *State* (1974), 159 Ind. App. 466, 307 N.E.2d 521.

The court has stated:

"A discussion of the knowledge which an accused must have in order to plead guilty involves three areas of concern:

I. The nature of the crime: does the accused understand the exact crime or crimes with which he is being charged —the elements which must be proved and how those elements relate to the facts of his conduct?

II. The constitutional consequences: does the accused understand the rights automatically waived by a guilty plea, and the effect that such waiver has on the conduct of the judicial proceeding?

III. The nature of the punishment: does he understand the minimum, mandatory minimum, maximum, consecu-

tive sentences that he may receive when convicted of the crime?" *Bonner* v. *State* (1973), 156 Ind. App. 513, 297 N.E.2d 867, 871-872.

There is no doubt that Brooks was properly advised of the constitutional consequences of his plea and of the sentence he would receive. The record of the guilty plea hearing shows the admonishment, and the hearing on the P.C. petition displays that Brooks understood the trial court judge:

> "Mr. Davis advised me very clearly. I understand him in showing me where, you know, where he, where I should have, you know, I shouldn't be, I could get cut loose or what not, and where I wouldn't be, shouldn't be frightened, you know. I mean it was more of an easy thing when he explained to me, although he's a judge and knows better than my lawyers, you know.
>
> Q. When you say Mr. Davis, you are referring to Judge Davis, right?
>
> A. Yeah, Mr. Davis.
>
> \* \* \*
>
> Mr. Davis, he presented it to me in a proper manner and he showed me what I could get and what I couldn't get and I could be turned loose if I went on, . . . ."

Brooks' contention on appeal is that the trial court committed error in failing to advise him of the legal elements of the crime of manslaughter.

The trial court, after thoroughly exploring the factual basis for the guilty plea, read the murder indictment to Brooks and informed him that he was pleading guilty to the charge of manslaughter as covered by the indictment although the elements of manslaughter, as such, were not specifically discussed.

The alleged error was not mentioned at the P.C. hearing nor in Brooks' Motion to Correct Errors. Brooks has never claimed that he did not understand the crime to which he entered his plea.

Brooks attempts to rely on *Brimhall* v. *State* (1972), 258 Ind. 153, 279 N.E.2d 557 to support his position. However, the defendant in *Brimhall* established that (1) no inquiry into

the facts of the alleged crime was made by court or counsel; (2) the facts did not support a conviction of the crime charged, i.e., assault with intent to commit mayhem; (3) Brimhall did not understand the crime with which he was charged, and had never before heard the word "mayhem"; and (4) Brimhall's attorney did not explain the charge to him.

In *Pursifull* v. *State* (1973), 157 Ind. App. 560, 301 N.E.2d 226, there was similar failure by the court to investigate the facts surrounding the guilty plea, and in fact the evidence did not support the plea. Further, Pursifull specifically testified at the Post-Conviction Hearing that he did not understand the elements of the crime charged, i.e., nonsupport of children. *Harshman* v. *State* (1953), 232 Ind. 618, 115 N.E.2d 501, and *Rhodes* v. *State* (1927), 199 Ind. 183, 156 N.E. 389 are similar in their facts.

In contrast, Brooks makes no showing of ignorance of the nature of the crime of manslaughter. The facts were fully explored and provide ample support for the plea of guilty. Before and at the time of his conviction, Brooks was represented by two privately retained attorneys who testified that they had discussed and explained the various alternatives to Brooks during the 18 months prior to his plea.

In advising Brooks relative to the crime of murder, i.e., the crime with which he was *charged,* the court below met the strictly construed dictates of *Bonner* v. *State, supra,* as it embodies the ABA Standards for Criminal Justice Pleas of Guilty. When, however, a defendant is not pleading guilty to the specific crime charged, but rather to a lesser included offense, it is unwise indeed for the court not to advise on the elements of the included offense. To do otherwise is to invite reversal in the event that the defendant thereafter alleges that he did not understand the nature of the offense to which he has pleaded, as opposed to the crime charged. Such reversal is not required in the case before us, however.

As noted in the Commentary to § 1.4(a) of the ABA Standards, the responsibility of the judge, in advising the

defendant as to the nature of the "charge", varies according to the circumstances of the individual case.

It is our conclusion, that since the trial court explained the elements of a greater charge, embracing the lesser included offense to which the defendant's plea was addressed, and since Brooks fails to make the barest allegation that he did not understand the nature of the crime to which he pleaded and since the facts fully support the guilty plea, the trial court was not required to find, as a matter of law, that the defendant did not knowingly and intelligently make his plea.

## III
### BROOKS' TRIAL COUNSEL RENDERED EFFECTIVE AND COMPETENT REPRESENTATION

Brooks' contention that he was inadequately represented is rebutted by the testimony of his trial counsel and by the record itself. Brooks first claims that his attorneys met with him only four times prior to the trial, and thus were unprepared and uninformed as to the facts of the case. This was directly rebutted by one of the attorneys at the P.C. hearing, who testified to approximately eight interviews in addition to court appearances. Furthermore, the hearing on the Motion to be Let to Bail covered two days and 150 pages in the transcript, and the record throughout displays the prior investigation and preparedness of defense counsel.

Brooks secondly complains that his mother, sister and certain others were not subponaed as alibi witnesses. While their testimony would have placed Brooks at the scene of the crime, apparently he would use it to prove that he was *inside* the house at the time of King's death.

It is interesting to note that Brooks first told the police that he was inside his mother's house all evening and thus knew nothing of King's death. Later, however, he stated that he had been in and out of the house several times, and that he had seen the deceased arguing with one Eddie Mathews, and upon returning to the porch Brooks discovered the body.

He then allegedly approached Eddie Mathews who gave him the two rings for safe-keeping. On investigating Brooks' second story, the police were unable to find any trace of an "Eddie Mathews".

In view of such circumstances, it is understandable that defense counsel might have felt reluctant to rely on the alleged "alibi". It is the sort of considered judgment that is expected of trial counsel. As was stated in *Jennings* v. *State* (1973), 156 Ind. App. 640, 297 N.E.2d 909, 912:

> " 'Moreover, the failure to call witnesses is a matter within the attorney's judgment and it cannot be relied upon as grounds for reversal.'

The court in *Bolden* v. *United States* (1959), 105 U.S. App. D.C. 259, 266 F.2d 460, at 461, stated:

> 'We do not know why trial counsel did not subpoena Magriver, whose address was not given, or "Ham", whose real name was unknown. He may well have decided, in view of Galloway's recantation, that as a matter of trial tactics it would be better not to present the alleged alibi. Whatever the reason for it, the decision was for the judgment of counsel and should not now be the basis for a charge of inefficiency. *Mitchell* v. *United States*, 104 U.S. App. D.C. 57, 259 F.2d 787, certiorari denied 1958, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86.' " *See also Pettit* v. *State* (1974), 160 Ind. App. 63, 310 N.E.2d 81.

It appears from all the evidence that Brooks faced the very strong possibility of a conviction for first degree murder carrying a sentence of life imprisonment. Instead, he is now serving a two to twenty-one year sentence and is eligible for parole after one year and nine months. As our Supreme Court recently observed in *Nicholas* v. *State* (1973), 261 Ind. 115, 300 N.E.2d 656, 663:

> "As we noted in the case of *Lowe* v. *State* (1973), [260] Ind. [610], 298 N.E.2d 421, 'In our view, there are, realistically speaking, some cases that just cannot be won simply because the evidence and witnesses against an accused are so overwhelming as to approach irrefutability.' . . . The attorney engaged in a recognized and well-accepted procedure in attempting to reduce the penalty that his client would have to suffer upon conviction. Appellant's constitutional

rights were not violated in any way as a result of his attorney's efforts to accomplish this goal on behalf of his client."

Brooks has failed to sustain the burden of proof imposed upon him by P.C. Rule 1, § 5. The judgment of the trial court denying his petition is therefore affirmed.

Buchanan and White, JJ., concur.

NOTE.—Reported at 316 N.E.2d 688.